Clifford J. Bond (CB-4679)
HELLER, HOROWITZ & FEIT, P.C
292 Madison Avenue
New York, New York 10017
(212) 685-7600

'09 CIV 5797

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MARCEL PIZ, RENE GARCIA, MARVIN
MERMELSTEIN, NACHUM STEIN,
ALEXANDER HASENFELD, INC. PROFIT
SHARING PLAN, ROBERT MILLET,
ROBERT LOEWY, STEVEN FRIEDMAN,
BRIAN SILBER, YITZHAK STEIN,
HANSFIELD-STEIN, INC. PENSION TRUST,
SIMON VOGEL, MORDECHAI VOGEL,
TOWER PAPER COMPANY INC.
RETIREMENT PLAN, DOUBLE U TRADING,
LP, DOUBLE U MASTER FUND, LP, LEVI
SCHAPIRA, YANGO FINANCE COMPANY,
NAFTALI VAX, FREDDY SINGER, JACOB
REINER, YOSEF YUD and HANA
GELDZAHLER,



**COMPLAINT AND DEMAND
FOR TRIAL BY JURY**

                                        Plaintiffs,

              -against-

AMEDIA NETWORKS, INC., FRANK
GALUPPO, JAMES D. GARDNER, RAJ
VARADARAJAN, JOHN R. COLTON, GARY
FELDMAN, JUAN MENDEZ, BOB MARTIN
and GERALD BUTTERS

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

    Plaintiffs, by their attorneys, Heller, Horowitz & Feit, P.C., as and for their

Complaint against the Defendants, allege as follows:

## INTRODUCTION

1.    This is an action to recover damages under the Securities Exchange Act of 1934 (the "Exchange Act"), and applicable state common law, based on, *inter alia*, Defendants' fraudulent conduct, negligent misrepresentations and omissions and market manipulation, which induced Plaintiffs to invest millions of dollars in Amedia private placements and/or to purchase on the open market and retain common stock of Defendant Amedia Networks, Inc. ("Amedia" or the "Company") at artificially inflated prices.

2.    Defendants, who are former officers and/or directors of Amedia -- a company that was, at all relevant times, purportedly in the business of providing residential media gateways to distribute and manage high quality and high speed voice and data services for networking throughout homes -- have preyed on Plaintiffs' and the public's awareness of burgeoning home media "triple-play" market opportunities and on false information supplied to Plaintiffs regarding the prospects and viability of Amedia's business.  Defendants engaged in an unlawful scheme whereby they knowingly, and/or with reckless disregard for the truth, made untrue public and private statements of material facts aggrandizing the supposed actual and expected business transactions and prospects of Amedia concerning, *inter alia*, its home media hardware and software.

3.    Through, *inter alia,* Amedia's website, Company newsletters, press releases, public filings with the Securities and Exchange Commission ("SEC"), public conference calls, interviews in well known mainstream publications published worldwide in hard copy and over the internet, and thorough other public and private statements and investor relation

activities, Defendants, for years constantly, but falsely, hyped the Company's business prospects as being quite promising.

4.    Plaintiffs not only directly relied on the false and fraudulent public and private statements and the intentional material omissions of the Defendants in purchasing (and retaining) Amedia stock, providing bridge loans and investing in Amedia private placements, but Defendants' false and fraudulent conduct also constituted a fraud-on-the-market causing the price of Amedia stock to become artificially inflated; thus, inducing Plaintiffs, based on the presumed efficiency of the market with respect to the price of Amedia stock, to purchase Amedia stock, and otherwise invest in, or loan money to, Amedia at such artificially inflated prices.

5.    Each of the individual Defendants who are current and/or former officers and directors of Amedia are jointly responsible and liable for the false and fraudulent statements contained in (and the omission of material information from) Amedia's website, Company newsletters, Company press releases, Company public filings with the Securities and Exchange Commission ("SEC"), Company public conference calls, interviews of Defendants in well known mainstream publications published worldwide in hard copy and over the internet, and in other public and private statements and investor relation activities, made while Defendants officers, directors and/or employees of Amedia by virtue of their direct involvement in making such statements and/or under the "group pleading" doctrine by virtue of their positions as corporate insiders intimately involved in the day-to-day operations of Amedia.

6.    Plaintiffs seek to recover in excess of millions in losses sustained by

them as a result of their purchases of Amedia common stock, and their other private loans and investments in Amedia, in reliance on the false and fraudulent material information (and omissions) publicly disseminated by Defendants.

7.     Unless otherwise stated, the allegations contained herein are stated "upon information and belief," and based upon Company newsletters, Company public filings, Company press releases, information published on the Company's web site, other public statements by Company officers and directors, the investigation of counsel and information otherwise provided to Plaintiffs.

## PARTIES

8.     Plaintiff Marcel Piz is a resident of the State of Florida.  Plaintiff Piz made private investments in Amedia, on or about May 1, 2006, through a private placement, through which Plaintiff Piz invested $125,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $.75/share.  These debentures are now worthless.  By virtue of this investment, Plaintiff Piz lost $125,000.00, plus interest.

9.     Plaintiff Rene Garcia is a resident of the State of California.   Plaintiff Garcia made private investments in Amedia, on or about May 1, 2006, through a private placement, through which Plaintiff Garcia invested $125,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $.75/share.  These debentures are now worthless.  By virtue of this investment, Plaintiff Garcia lost $125,000.00, plus interest.

10.    Plaintiff Marvin Mermelstein is an individual residing in the City and State of New York.  Plaintiff Mermelstein made private investments in Amedia, on or

about May 1, 2006, through a private placement, pursuant to which Plaintiff Mermelstein invested $500,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $.75/share.  These debentures are now worthless.  By virtue of this investment, Plaintiff Mermelstein lost $500,000.00, plus interest.

11. Plaintiff Mermelstein also made private investments in Amedia, on or about March 1, 2007, through a private placement, pursuant to which Plaintiff Mermelstein invested $275,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $1.00/share.  These debentures are now worthless.  By virtue of this investment, Plaintiff Mermelstein lost $275,000.00, plus interest.

12. Plaintiff Nachum Stein is an individual residing in Brooklyn, New York. Plaintiff Nachum Stein made private investments in Amedia, on or about May 1, 2006, through a private placement, through which Plaintiff Nachum Stein invested $60,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $.75/share.  These debentures are now worthless.  By virtue of this investment, Plaintiff Nachum Stein lost $60,000.00, plus interest.

13. Plaintiff Nachum Stein also made private investments in Amedia, on or about January 23, 2007, through a private placement, through which Plaintiff Nachum Stein invested $250,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $1.00/share.  These debentures are now worthless.  By virtue of this investment, Plaintiff Nachum Stein lost $250,000.00, plus interest.

14. Plaintiff Alexander Hasenfeld, Inc. Profit Sharing Plan ("Hasenfeld Profit Sharing") is a profit sharing plan, based in Brooklyn, New York.  Hasenfeld Profit Sharing made

private investments in Amedia, on or about May 1, 2006, through a private placement, through which Plaintiff Stein Profit Sharing invested $50,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $.75/share.  These debentures are now worthless.  By virtue of this investment, Plaintiff Hasenfeld Profit Sharing lost $50,000.00, plus interest.

15.    Plaintiff Robert Millet is an individual residing in the City and State of New York.  Plaintiff Millet made private investments in Amedia, on or about May 1, 2006, through a private placement, through which Plaintiff Millet invested $20,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $.75/share.  These debentures are now worthless.  By virtue of this investment, Plaintiff Millet lost $20,000.00, plus interest.

16.    Plaintiff Robert Loewy is an individual residing in the City and State of New York.  Plaintiff Loewy made private investments in Amedia, on or about May 1, 2006, through a private placement, through which Plaintiff Loewy invested $25,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $.75/share.  These debentures are now worthless.  By virtue of this investment, Plaintiff Loewy lost $25,000.00, plus interest.

17.    Plaintiff Steven Friedman is an individual residing in the City and State of New York.  Plaintiff Friedman made private investments in Amedia, on or about May 1, 2006, through a private placement, through which Plaintiff Millet invested $15,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $.75/share.  These

debentures are now worthless.  By virtue of this investment, Plaintiff Millet lost $15,000.00, plus interest.

18.    Plaintiff Brian Silber is an individual residing in the City and State of New York.  Plaintiff Silber made private investments in Amedia, on or about May 1, 2006, through a private placement, through which Plaintiff Silber invested $15,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $.75/share.  These debentures are now worthless.  By virtue of this investment, Plaintiff Silber lost $15,000.00, plus interest.

19.    Plaintiff Yitzhak Stein is an individual residing in the City and State of New York.  Plaintiff Yitzhak Stein made private investments in Amedia, on or about May 1, 2006, through a private placement, through which Plaintiff Yitzhak Stein invested $40,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $.75/share.  These debentures are now worthless.  By virtue of this investment, Plaintiff Yitzhak Stein lost $40,000.00, plus interest.

20.    Plaintiff Hansfield-Stein, Inc. Pension Trust, is a corporation duly formed under the laws of the State of New York, with an office in the City and State of New York. Plaintiff Hasenfeld-Stein made private investments in Amedia, on or about January 23, 2007, through a private placement, through which Plaintiff Hasenfeld-Stein invested $250,000.00 in Amedia in exchange for debentures convertible into common shares of Amedia stock at $1.00/share.  These debentures are now worthless.  By virtue of this investment, Plaintiff Hasenfeld-Stein lost $250,000.00, plus interest.

21.    Plaintiff Simon Vogel is an individual residing in Far Rockaway, New York.  Plaintiff Simon Vogel made private investments in Amedia, on or about August 10, 2004,

through a private placement through which Plaintiff Simon Vogel invested $100,000.00 in

exchange for Series A preferred debentures convertible into common stock at $.75/share, and on

or about May 3, 2006, through a private placement, through which Plaintiff Simon Vogel

invested $100,000.00 in Amedia in exchange for two year senior convertible debentures

convertible into common shares of Amedia stock at $.75/share.  These debentures are now

worthless.  By virtue of these investments, Plaintiff Simon Vogel lost $200,000.00, plus interest.

22.    Plaintiff Mordechai Vogel is an individual residing in Far Rockaway, New

York.  Plaintiff Mordechai Vogel made private investments in Amedia, on or about August 10,

2004, through a private placement through which Plaintiff Mordechai Vogel invested

$100,000.00 in exchange for Series A preferred convertible debentures convertible into common

stock at $.75/share, and on or about May 3, 2006, through a private placement, through which

Plaintiff Mordechai Vogel invested $100,000.00 in Amedia in exchange for two year senior

convertible debentures convertible into common shares of Amedia stock at $.75/share.  These

debentures are now worthless.  By virtue of these investments, Plaintiff Mordechai Vogel lost

$200,000.00, plus interest.

23.    Plaintiff Tower Paper Company Inc. Retirement Plan ("Tower Paper") is a

retirement plan based in Brooklyn, New York.  Plaintiff Tower Paper made private investments

in Amedia, on or about August 10, 2004, through a private placement through which Plaintiff

Tower Paper invested $50,000.00 in exchange for Series A preferred convertible debentures

convertible into common stock at $.75/share, andon or about May 3, 2006, through a private

placement, through which Plaintiff Tower Paper invested $100,000.00 in Amedia in exchange

for two year senior convertible debentures convertible into common shares of Amedia stock at

$.75/share.  These debentures are now worthless.  By virtue of these investments, Plaintiff Tower Paper lost $150,000.00, plus interest.

24.    Plaintiff Tower Paper also loaned $83,000.00 to Amedia as part of a bridge loan.  This loan never was repaid by Amedia to Tower Paper.  Accordingly, Tower Paper has been damaged in the amount of $83,000.00, plus interest.

25.    Plaintiff Tower Paper also purchased 331,251 shares of Amedia common stock on the open market during the period from in or about November, 2005 through and including June, 2007 for a total purchase price of 973,538.00.  Plaintiff Tower Paper still retains these shares which now are worthless.  By virtue of these purcahses of Amedia common stock, Tower Paper has been damaged in the amount of $973,538.00, plus interest.

26.    Plaintiff Double U Trading, LP ("Double U Trading") is a business formed under the laws of the British Virgin Islands.  Commencing on February, 2006. Double U Trading purchased shares of Amedia common stock on the open market.  By virtue of such purchases, Plaintiff Double U Trading's losses are reasonably believed to be not less than $437,386.00.

27.    Plaintiff Double U Master Fund, LP ("Double U Master") is a business formed under the laws of the British Virgin Islands.  Commencing in March 2006, Plaintiff Double U Master purchased shares of Amedia Common Stock on the open market.  Plaintiff Double U Master still holds 207,122 of these shares of Amedia common stock.  By virtue of such purchases, Double U Master's losses, to date, are reasonably believed to be not less than $345,100.00, plus interest.

28.    Plaintiff Double U Master also made private investments in Amedia on or

about April 5, 2007, through a private placement.  Double U Master invested $1.5 million in
Amedia in exchange for preferred stock convertible into common shares of Amedia stock.  This
convertible stock is now worthless.  By virtue of this investment, Plaintiff Double U Master lost
$1.5 million, plus interest.

29.   On or about October 18, 2006 and January 19, 2007, Plaintiff Double U
Master gave Amedia "Bridge" loans of $500,000.00 and $356,000.00, respectively.  These loans
never were repaid by Amedia to Double U Master.  By virtue of such loans Double U Master has
lost an additional $956,000.00, plus interest.

30.   Plaintiff Levi Schapira is an individual residing in Brooklyn, New York.
Plaintiff Shapira made private investments in Amedia on or about April 20, 2005, through a
private placement through which Plaintiff Shaapira invested $275,000.00 in exchange for
preferred debentures convertible into common shares of Amedia stock.  These debentures are now
worthless.  By virtue of this investment, Plaintiff Schapira lost $275,000.00, plus interest.

31.   Plaintiff Yango Finance Company ("Yango") is a business based in Israel.
From on or about February 17, 2005 through and including on or about February 7, 2007, Plaintiff
Yango purchased 444,500 shares of Amedia Common Stock on the open market for an average
share price of $.85 per share and a total cost of $379,315.00.  Plaintiff Yango still holds all of
these shares of Amedia common stock.  By virtue of such purchases, Yango's losses, to date, are
$379,315.00, plus interest.

32.   Plaintiff Naftali Vax is an individual residing in Israel. From on or about
January 28, 2005 through and including on or about April 11, 2006, Plaintiff Vax purchased
177,982 shares of Amedia Common Stock on the open market for an average share price of $.83

per share, and at a total cost of $147,725.00  On or about June 23, 2008, Plaintiff Vax sold all

177, 982 shares for $648.61.00.  By virtue of such purchases and sales, Vax's losses are

$147,076.00 plus interest.

33.    Plaintiff Freddy Singer is an individual residing in Israel.  From on or

about February 22, 2006 through and including on or about September 7, 2006, Plaintiff Singer

purchased on the open market 164,000 shares of Amedia common stock for a total purchase price

of $142,443.03.  Plaintiff Singer still retains 50,000 of these shares of Amedia common stock.  By

virtue of Plaintiff Singer's purchases of Amedia common stock, Plaintiff Singer's losses are

$42,368, plus interest.

34.    Plaintiff Yosef Yud is an individual residing in Israel.  During the period

from June, 2004, through and including June, 2008.  Plaintiff Yud purchased shares of Amedia

common stock.  By virtue of such purchasers, plaintiff Yud has been damaged in an amount to be

determined at trial.

35.    Plaintiff Jacob Reiner is an individual residing in Israel.  Plaintiff Reiner

purchased shares of Amedia common stock.  By virtue of such  purchasers, plaintiff Reiner has

been damaged in amount to be determined at trial.

36.    Plaintiff Hana Geldzahler is an individual residing in Israel.  Plaintiff

Geldzahler purchased 12,866 shares of Amedia common stock on the open market for $12,499.42.

 Plaintiff Geldzahler still holds these shares of Amedia common stock which are now worthless.

By virtue of Plaintiff Geldzahler's purchase of Amedia common stock, Plaintiff Geldzahler's

losses are $12,499.42, plus interest.

37.    Defendant Amedia is incorporated in the State of Delaware, its principal

business address at all relevant times was located in the State of New Jersey.  Its common shares began feely trading on Over the Counter Bulletin Board (the "OTCBB") on or about June 4, 2004 at or about $.83 per share.  Amedia ceased conducting business operations on or about February 12, 2008.

38.   Defendant Frank Galuppo is a resident of the State of New Jersey. Defendant Galuppo was the President and Chief Executive Officer ("CEO") of Amedia.  He also was a member of the Board of Directors of Amedia.  Defendant Galuppo assumed his positions with Amedia in or about March, 2004.  He resigned his positions with Amedia on or about February 12, 2008.

39.   Defendant James D. Gardner is a resident of the State of New Jersey.  At relevant times, Defendant Gardner was Amedia's Chief Financial Officer ("CFO") and Senior Vice President of Business Operations.  Defendant Gardner resigned as an officer and employee of Amedia in or about 2008.

40.   Defendant Raj Varadarajan is a resident of the State of New Jersey. Defendant Varadarajan joined Amedia as Vice President of Business Operations and Product Management in or about June 2004.  He resigned his positions with Amedia.

41.   Defendant John Colton is a resident of the State of New Jersey. Defendant Colton was the Vice President of Engineering and Chief Technology Officer of Amedia.  He joined Amedia in or about June, 2004, and resigned from his position with Amedia on or about June 13, 2007.

42.   Defendant Gary Feldman is a resident of the State of New Jersey.

Defendant Feldman joined Amedia in or about September, 2004 as the Vice President of Marketing and Business Strategy.  Defendant Feldman resigned as an officer and employee of Amedia on or about August 3, 2006.

43.   Defendant Juan Mendez is a resident of the State of Florida.  At relevant times Defendant Mendez was the Chairman of the Board ("COB") of the Board of Directors of Amedia.  At relevant times Defendant Mendez was a major shareholder in Amedia.

44.   Defendant Bob Martin is a resident of the City and State of New York. Defendant Martin, was a member of Amedia's Board of Directors ("BOD") from in or about June 2004, through and until his resignation from Amedia's BOD on or before February 12, 2008.

45.   Defendant Gerald Butters is a resident of the State of Florida. Defendant Butters, was a member of Amedia's Board of Directors from in or about June, 2004 through and until his resignation from Amedia's BOD on or about February 12, 2008.

## JURISDICTION AND VENUE

46.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.  This Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

47.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that, *inter alia*, substantial part of the events giving rise to the claim occurred in this District; and pursuant to 15 U.S.C. § 78aa in that, *inter alia*, the Defendants transmitted the materially false and fraudulent information from and into this District, and Defendants otherwise engaged in acts relating to the claimed violations in this District.

13

## BACKGROUND

48.    Amedia was incorporated in July, 1994 under the name TTR Technologies, Inc. ("TTR"). The assets of TTR, which purported to develop copy protection products for optical media, were sold to Macrovision in or about 2003.  On or about May 25, 2004, TTR changed its name to Amedia and it began a new business model whereby Amedia purportedly began development of optical fiber routing equipment.  More specifically, in press releases and elsewhere, Amedia purported to be "a provider of next generation media gateways to distribute and manage ultra-broadband triple-play services in the home."  As Amedia stated on its website:

> "[i]n plain English, this means that "every home,
> apartment, school and business . . . [will be able to] receive
> their own secured bandwidth connection over copper or
> fiber . . . for voice, data, and video services with guaranteed
> levels of quality.  We offer the gateways that enable service
> providers to deliver the bundle of services that they must
> offer to stay competitive in a dramatically changing
> marketplace."

49.    Amedia's stock began trading on the OTC Bulletin Board on or about June 4, 2004 under the symbol AANI.

50.    From in or about June, 2004 through and including at least August, 2007, on the Company website, in numerous press releases, public filings, newsletters and in other public and private statements, as detailed below, Defendants routinely touted the purported accomplishments and progress of Amedia in developing and implementing its bundled gateways.

51.    By press release dated June 1, 2004, Amedia announced the introduction

of "QoStream (™) Fiber-to-the Premises (FTTP) access solution," describing it as an "ultra-broadband, carrier-class optical platform designed for service providers, cable operators, municipalities, and real estate developers to deliver cost effective high speed internet access, high definition and standard definition digital video and Voice over Internet Protocol (VOIP) services to businesses and residential customers." In this press release, Amedia further stated that "The Amedia Networks product family will begin to be available in the third quarter of this year [2004]."

52.   In the June 1, 2004 press release, Defendant Galuppo further stated that 'Our QoStream solution provides a platform for an open service delivery network that will lower initial costs and will reduce OA&M expenses,' and that '[w]e are excited to be bringing to the market a complete FTTP system that was specifically designed and tested for fiber access triple play applications.'

53.   By press release dated June 18, 2004, Amedia announced that it had relocated its corporate headquarters to Holmdel, New Jersey, to, as stated by Defendant Gallupo, 'further position the company for rapid growth as it transitions from product design and development to execution-state product delivery, sales and marketing.'

54.   By another press release dated June 18, 2004, Amedia announced that it had expanded its technology licensing agreement with Lucent Technologies and that it expected the enhanced design of its CS1200 Core Switch to be completed in early 2005.

55.   By press release dated August 9, 2004, Amedia announced that it had raised $5.25 million in a private placement in exchange for the issuance to the private investors of Convertible Preferred Stock, with an initial conversion rate of $0.75 per share. In this press

release, Defendant Galuppo stated that '[t]his financing represents an important milestone for Amedia, greatly improving our competitive position both in the U.S. and internationally.' Amedia also announced in the same press release that it had secured an additional $6 million equity line of credit.

56.    By press release dated October 5, 2004, Amedia announced that it would host a live demonstration of its QoStream ™ platform at the United States Telecommunications Association's October, 2004 event in Las Vegas.  Amedia claimed in this press release that "[t]he demonstrations will highlight the industry-leading quality of service, reliability, performance, and management capabilities that make the QoStream product family the ideal vehicle for local telephone companies to offer triple-play services."  In this press release, Defendant Galuppo stated that '…. these products are robust and flexible they're the ideal solution for many of our customers . . . . We believe there is nothing like them in the marketplace . . . .'

57.    By press release dated October 18, 2004 Amedia announced a joint initiative with LB&T Partners, Ltd., a European Marketing Company.  In this press release, Defendant Galuppo stated that '[o]ur business model is to frequently rely on leading specialists in their field and to develop a close partnership with them rather than immediately expanding our own staff and undergoing a steep learning curve.'

58.    In Amedia's 2004: Issue 1 "Update on Amedia" newsletter (the "November 2004 Update"), released on or about November 1, 2004, and captioned "255 Days and Counting" Defendant Galuppo stated that: the "near term" promise for Amedia's success was "ever more certain;" "we are onto something here;" "we are taking the right steps;" and "our hard work and experience will translate into a successful and growing company."

59.    Defendant Galuppo further stated in the November 2004 Update that during the prior 37 weeks Amedia had numerous accomplishments including:  creating a new corporate identity; bringing in outstanding senior management; substantially redirecting "much of the development of the products to reflect our market engagements; and developing "relationships with key distributors."

60.    Defendant Galuppo further stated in the November 2004 Update that: "I see no reason to back off my original commitment to the shareholders of this company to bring in revenue by the beginning of the third quarter in 2005;" "we are frugal with our investors money and spend it wisely;" and that although additional investment will be necessary, the prospects for Amedia to grow with the market "and become a major player within it are mighty compelling."

61.    The November 2004 Update also noted that "Legg Mason likes the odds of Active Ethernet/ESON products" and in a section captioned "**This Market is Now!**" it quoted an article from the New York Times about the growing market and the Update stated that while no market leader had yet emerged, "[w]e have yet to come across any reason why that leadership will not be Amedia."

62.    Finally, the November 2004 Update discussed that Amedia's Vice President of Engineering John Colton, formerly of Lucent, "shared the same vision and view for Amedia's outlook for success."

63.    By press releases dated November 23, 2004 and February 15, 2005, Amedia touted, respectively, new agreements with LightRiver Technologies, Inc, for distribution of QoStream ™ and with Lightspeed Technologies for, Inc. to include "QoStream products as part of LightSpeed's overall value proposition."

17

64.    By press release dated February 17, 2005, and captioned "**Amedia**

**Wins Leading Distribution Partner in the World's Largest Market** – *Leading Provider of*

*Video Access Systems in China to Distribute Amedia's QoStream* ™ . . . [,]" Amedia announced

that it had entered into an agreement in, "The World Largest Market" with the "leading provider

of Video Access Systems in China," "Sichuan Jiuzhou Electric Group Co., Ltd. (Jiuzhou"), to

distribute QoStream.  This press release further stated that Jiuzhou "had retained the leading

market position in China for CATV-related access products, and is currently poised to be a

leading provider of IP-TV solutions for the video industry."

65.    The February 17, 2005 press release quoted Jiuzhou's general manager as

stating that:  'Amedia's QoStream . . . products . . . represent the ideal solution for IP-TV

capability that we want to offer our customers[,]'  'Along with their VOIP and data capabilities,

they will be at the heart of our triple play offering with the features and flexibility that our

customers are demanding."

66.    Defendant Galuppo stated in the February 17, 2005 press release that

"China and the Pacific Rim in general, offer tremendous growth opportunities . . . . By some

industry estimates, Asia will represent 45% of total global spending on FTTP and FTTN . . . . In

light of Amedia's intent to emerge as a dominant player in this exciting, high growth region of

the world, partnering with a premier company such as Jiuzhou is a vital step for us, and will

substantially help us towards achieving this ambitious objective."

67.    By press release dated February 28, 2005, Amedia announced, *inter alia*,

the unveiling of a "New and Unique Triple Play Solution for Carriers Deploying Fiber to Node

Access."

18

68.    On or about March 16, 2005, Amedia issued the "2005: Issue 1" "Update on Amedia" newsletter (the "March 2005 Update").  In this Update, Defendant Galuppo stated that products had been supplied to customers for evaluation and that "Thus far, we have had only positive feedback; our products have performed superbly."

69.    Defendant Galuppo further represented in the March 2005 Update as follows:  "I continue to believe that we will have contracts signed before the end of the first half of 2005, with revenue following in the second half [,]" and that the company's efforts "led to recently announced, first of its kind, FTTN/VDSL product enhancement, which has been extremely well received by the industry."

70.    Also in the March 2005 Update Galuppo advised that analysts are increasingly seeking Amedia's "insights into access technologies and the access market," that Amedia's "solutions are the subject of growing attention in the trade press," and that "[w]e have been asked to speak at several major industry conferences . . . ."

71.    Defendant Galuppo continued to tout Amedia in the March 2005 Update, stating, *inter alia*, that he "remain[ed] more positive than ever that this is the right Company, in the right market at the right time[,]" and that he was "confident" of Amedia's "growth and prosperity."

72.    By press release dated April 25, 2005, Amedia announced that it had secured through a private placement an additional $6 million of long term financing, in exchange for preferred stock convertible into shares of Amedia common stock at an initial conversion rate of $1.01 per share.

73.    In the April 25, 2005 press release, Defendant Galuppo stated that '[s]ince

19

we opened our door one year ago, we have methodically moved this business forward at a remarkably rapid pace – and all the while maintaining a minimal cash burn/just-in-time approach to funding.' 'Our investors have and will continue to benefit from this strategy." Defendant Mendez stated in this press release that "investors 'enthusiastically and confidently support management's business and market strategies.' He continued, 'Amedia has adopted a unique business approach for this industry that positions it for long term growth and sustainability . . . and our investors appreciate that.'"

74.    At Amedia's 2005 annual shareholder's meeting, as detailed in Amedia's June 10, 2005 press release, Defendant Galuppo continued to sing the praises of Amedia, including, *inter alia*:

- Noting Amedia's 'commitment' 'to ensure that Amedia is managed progressively and responsibly' to avoid painful consequences that could arise from 'aggressive growth without thoughtful execution;'

- Stating that 'I can think of few other companies that have moved so rapidly in this industry – it's really quite astonishing.'

- Reiterating his expectation that Amedia would generate revenue during the second half of 2005; and

- Stating that 'in summary, the exploding global demand for ultra-broadband services puts Amedia in the right place at the right time. Our Ethernet solutions are based on the right technology that is increasingly being viewed as a preferred means for implementing those ultra-broadband services. Amedia has a set of exceptional leaders and superb engineers - the likes of which are rarely found in a company of our size and age. . [sic] Amedia has the potential to attain greatness and we are committed to achieving no less.'

75.    By press release dated June 20, 2005, Amedia announced that it had entered into its first contract "an Agreement with Tai Lang Communications to provide Fiiber-To-The-Premises Systems in China." In the press release Amedia stated that the contract "could

be valued up to $9 million over two years . . . ." The caption of this press release included the following: "Stability, Reliability and the 'Highest Throughput' Cited as Basis for Win." Defendant Galuppo stated in this press release that '[w]e view this [contract] as a validation of our decision to focus on low cost operations, symmetrical 100Mbps services and the service quality guarantees.   We were also quite proud that our equipment inter-operated exceedingly well with other vendors' . . . switches.'

76.    On or about August 2, 2005, Amedia issued its "2005:  Issue 2" Update on Amedia, captioned "A Big Moment for Amedia" (the "August 2005 Update"), in which Defendant Galuppo described the Tai Long agreement as an Amedia milestone that stood apart from others, and in which Defendant Galuppo described Tai Long as "gaining increasing clout in China;" and as an "aggressive growing company in the right market space and with the right partners."

77.    In the August 2005 Update, Defendant Galuppo reiterated many of the points made in Amedia's June 20, 2005 press release, and stated that Amedia was "making excellent progress as a young enterprise, and I continue to feel strongly that our future is bright and full of promise." Amedia also touted in this Update the "super month" that it had in June during which "record visitors" came to the Amedia exhibit at the "Supercomm2005" exhibition.

78.    By press release dated September 7, 2005, Amedia announced that it had "expanded its headquarters by twenty-five percent to launch a top-tier customer technical support center that will provide support on a global basis." Defendant Galuppo described this as "an exciting period of anticipated growth." Amedia's CFO, Defendant Gardner is quoted in this

press release as stating that "in addition to leading-edge products, 'a responsive and

knowledgable support structure is a key component of our overall situation.'"

79.   By press release dated September 14, 2005, Amedia announced that

Defendant Galuppo would be a "featured panelist at the upcoming Annual Gilder/Forbes

Telecosm Conference," which Amedia described as being "world famous" and as being

"recognized as one of the most prestigious venues in the world for breaking information on

breakthrough technologies and forward thinking companies."

80.   By press release dated October 20, 2005, Amedia announced that its

Ethernet Home Gateway was going to be available for shipping in December, 2005.  Amedia

hyped its HG-V100 Gateway as being "the first such in the market with the range of capabilities

and features that telephone companies have sought-out . . . ."  Defendant Galuppo claimed in this

press release that Amedia had received "extremely positive reactions from prospective

customers" to this Gateway, and the press release quotes the vice president of marketing at

Ikanos (which made a chip used by Amedia) as stating that: 'Amedia is emerging as a key player

in the exploding market for residential gateways . . . .'

81.   In a press release dated October 24, 2005, Amedia announced that a

Brazilian telecommunications provider  (CSM) had made an initial order for QoStream, and

quoted that company's CEO stating that:  'It is the intent of CSM to be the first carrier in South

America to make available a full triple play offering to subscribers.  I believe that there will be a

huge demand for our service. . . . Amedia's QoStream products have all the right attributes to

enable us to do just that with outstanding price performance and value."

82.   By press release dated October 25, 2005, Amedia announced a deal with

Hans Communications in Mongolia to install QoStream products.  The president of Hans is quoted in this press release stating that ". . . technology such as that provided by Amedia Networks, is proving sufficiently cost-effective and beneficial to enable us to undertake this historic effort here in Mongolia."

83.   Amedia also announced other agreements towards the end of 2005 in press releases and other public statements and filings continuing to give the impression to the public that Amedia was thriving.

84.   In November 2005, Amedia issued another operational Update to its shareholders, also addressed in an Amedia November 8, 2005 press release (the "November 2005 Update").  In this Update, Defendant Galuppo reviewed and touted Amedia's agreements in China, Brazil and [Mongolia] and the expansion of Amedia, and in which Defendant Galuppo also continued to hype the Company's prospects by:

- Stating that Amedia's product line had grown;

- Stating that "we expect [HG-V100] will become commercially available in December 2005;"
- Stating that "We believe our HG-V100  . . . will be the first such product commercially available in the market with the range of capabilities and features that telephone companies have been actively demanding to support their ultra-broadband deployments;"

- Stating that "This product [HG-V100] is a testimony to the ability of our team to rapidly recognize and seize the opportunities that present themselves in this formative market;" and

- Stating that "I firmly believe that the market is just unfolding and defining itself.  Now is the time when we need to execute on building a firm foundation to allow us to participate in this growth."

23

85.   On or about November 15, 2005, Defendant Galuppo appeared on CNBC to publicize Amedia, and, in particular, Amedia's purported opportunities in Mongolia and China.  Defendant Galuppo stated in the CNBC interview that Amedia was able to provide to homes or businesses "significantly higher bandwidth than can be supplied today over DSL," and that in Mongolia, where Amedia had partnered with Hans Communications -- which had made considerable investment into making Amedia's services possible -- "there was a lot of opportunity to improve communication to the homes and businesses there we are providing equipment to do just that."

86.   In the CNBC interview, Defendant Galuppo further stated that Amedia had "won a contract in China back in June with Tai Long Communications out in Shang Du province . . . . where a great deal of construction is going on and where real estate developers are looking for a triple play service to provide the best communications possible to its citizens.  In addition, we have a similar project going on in  . . . Brazil . . . ."

87.   By press release dated March 29, 2006, Amedia announced "the introduction of the most versatile and efficient solution for telephone companies seeking to provide the Triple Play services to the approximately 24% of U.S. households living in multiple dwelling units."  (Amedia's MDUstream solution).

88.   On April 12, 2006, Amedia announced that it had made its first U.S. shipment of outdoor Home Gateways.  Defendant Galuppo described this event as 'a significant milestone for our company,' and claimed that it 'validates that our products work as advertised and provide the promised value to our customers.'  Defendant Galuppo further stated that 'Home Gateways of this type will play a major role for service providers  . . . . The market for Home

24

Gateways is projected to grow over the next several years reaching $1.5 billion per year in the U.S. by 2009. We are proud to be one of the first to ship products of this kind to U.S. customers.'

89.    On or about April 3, 2006, stockwire.com, did an online video "stockumentary" on Amedia. The stockumentary narrator, Adrian James, described Amedia's management team as being "one of the most impressive management teams we have ever come across," who joined Amedia because "they truly believe Amedia's technology *is* the future of broadband." The narrator noted that Amedia's triple play technology was able to offer bandwidth of "100 megabits per second" as opposed to the currently available "3 megabits per second," and that "that is a huge difference and that is why all those powerful minds have come together [at Amedia] to make the [Amedia] triple play a reality."

90.    Defendant Galuppo was interviewed in this stockwire "stockumentary." In discussing Amedia's purported advantages over competition, Defendant Galuppo noted that:

- Amedia had "unique licenses from Lucent Technologies, Bell Laboratories, that provides some unique chartacteristics to the solution that we provide;"

- Amedia had "a very robust set of products that are built specifically to be put with the major carriers around the world;"

- Amedia provided "a hardened solution that can go outside and can withstand the serious temperature ranges that vary in this country and for that matter around the world;"

- Amedia also provided "what's called a 'quality of service guaranty' that enables us to ensure that the prioritization of different services coming into the home, whether it be voice, video, and data, are in fact protected so that one service is not interrupting the other . . . we provide the type of software that ensures that those services are protected from a priority standpoint coming into your home;"

25

- Amedia had an "enormous amount of experience . . . in terms of the development of these products, and putting a lot of creativity to future features that these products require. . . . as we go forward we are certainly going to better design these products to meet additional requirements of the marketplace and we can do that very effectively."

- "[O]ur vision over the next two years is to become a major supplier of fiber to the node and fiber to the premise equipment . . . . here in the United States . . . [and] outside the United States.  We certainly have an aspiration to be a global company, to achieve the kind of goals our shareholders would expect from us in terms of providing a good solid investment for them to gain a financial benefit from;"

- The market is very big, based in forecasting information, by 2009, the U.S. market will be "$2.2 billion," and worldwide the market will be "$10 billion;"

- We have a residential gateway that . . . can be sold as a stand alone product, that in essence is the next generation DSL modem;" and

- "So, it's a huge opportunity and we think we're on the leading edge of this technology and, therefore, we expect to get off to a very quick start, you know, working with the major carriers around the world."

91.    Defendant Feldman addressed the Amedia technology, and introduced its products, in the stockumentary, touting the hardware made by Amedia and the capabilities of Amedia's products.  Defendant Feldman further stated that: "'Telcos' are in trouble . . . . So there's a real incentive for them to do something and do something quick.  And to do that they need to buy the stuff that we make . . . ."

92.    The narrator concluded the "stockumentary" by being highly complimentary of Amedia and its prospects, stating that: "As you can see, Amedia Networks. . . has positioned themselves to be a leader in this multibillion dollar race to the curb.  We are excited about Amedia Networks and the potential the company has. *We think it would be a great asset to any investor's portfolio*." (Emphasis supplied).

26

93.    In an April, 2006 letter to stockholders, which is described in Amedia's April 19, 2006 press release Amedia, through Defendant Galuppo, continued to over-hype Amedia, stating that: the "progress" that it had made through the above mentioned transactions; Amedia's "high levels of visibility" achieved through marketing; the formation of "a respected and influential Advisory Board;" "and a series of successful demonstrations and trials of the Company's solutions."  Defendant Galuppo also reiterated a quote attributed to Motorola Vice President of Wireline Access Solutions that:  "Motorola is proud to work with Amedia  . . . [,] "and he stated that "Amedia's aggressive response to industry shifts enabled us to bring the right mix of assets to our relationship with Motorola – a worldwide leader in video delivery to the home."  Defendant Galuppo also stated that "progress has been continuing at an encouraging pace . . . ."

94.    Amedia closed another private placement financing in or about May 2006.  This financing was for $10 million in exchange for secured convertible debentures and warrants at a conversion price of $1.5 per share.  Defendant Galuppo publicly hyped such financing as 'an affirmation that we are on the right path in executing our business plan.'

95.    In a June 20, 2006 press release, Amedia announced the hiring of Alliance Advisors to "optimize communications with both current and former investors."  Alliance's president is quoted in this press release stating that 'Amedia continues to successfully execute their business plan to become a leading designer, developer and distributor of home gateways and other ultra-broadband access solutions . . . ."

96.    On or about July 17, 2006, Defendant Gardner, Amedia's then CFO, and Senior V.P. of Business Operations, spoke by telephone with a representative of Plaintiffs.

27

During this conversation, Mr. Gardner represented that Amedia was in advanced negotiations with Motorola, which was expected to lead to Amedia receiving approximately $40 million in purchase orders from Motorola.

97.   Defendant Gardner also represented during the July 17, 2006 telephone conversation that Amedia was in serious discussions with Bellsouth for the sale of Amedia's product or products to Bellsouth.

98.   On or about July 17, 2006, when Defendant Gardner made the express representations in connection with Motorola and Bellsouth, Defendant Gardner know, or should have known, that these representations were false and that Defendants: were not in serious negotiations with Motorola; Defendants did not expect purported negotiations with Motorola to result in Amedia receiving approximately $40 million from Motorola for purchases from Ameida; and that discussions with Bellsouth were very preliminary and not meaningful.

99.   On or about July 24, 2006, Amedia issued an operational Update, "2006: Issue 1," "Good Progress with Motorola", in which Defendant Galuppo reported that progress with Motorola was going "quite well;" that he was "genuinely excited by our relationship with Motorola and with several other strategic partners – all focused on our expertise in Home Gateways and other building solutions . . . . In the United States this impacts 24% of the households, or about 30 million units." In this Update, Amedia continued to hype its concept lab; its Home Gateways, stating that it was one of only a handful of companies that have what might truly be considered to be commercially viable Home Gateways; and its public visibility.

100.  On August 2, 2006, Amedia announced a revised agreement with Lucent

reducing future royalty payments on products licensed to Amedia by Lucent.  Defendant Galuppo

stated in the press release that the revised agreements 'could not have come at a better time for

AANI as we transition from a developmental stage Company into a revenue producing firm;' that

the reduction would be a boon to Amedia's cash flow; and Amedia's belief that "the true

financial impact and appreciation by shareholders of this revision . . . will be realized as we

execute on our business strategy by shipping AANI products to the market."

    101.  In a press release dated August 22, 2006 Amedia announced its financial

results for the second quarter of 2006.  In this press release, Defendant Galuppo stated that in the

second quarter of 2006 Amedia "reached several key accomplishments which should enable us to

successfully launch our products in the mass market in 2007.  Recently, we completed another

critical milestone in our strategic alliance with Motorola. . . ."

    102.  In three separate press releases issued in September and October 2006,

Amedia announced that it was making presentations at the Arch Investment Conference, the

NJTC Growth Company Showcase 2006 and the 10th Annual Gilder/Forbes Telescom 20006

Conference.

    103.  On November 11, 2006 Amedia publicly announced its "new Broadband

Entertainment Center" platform, a beta system of which was scheduled for shipment in the first

quarter of 2007.  Defendant Galuppo claimed this new platform would take "the residential

gateway to the next level,"

    104.  In its Q3 Operational Update, issued in November 2006, and in the related

November 17, 2006 press release, Amedia continued its propaganda campaign, reiterating many

of the aforementioned plugs for its products, claiming that its integration of technology from

Tzero "has made wireless video a reality," hyping its relationship with Motorola and otherwise predicting an "exciting 2007 in our industry" including far greater subscriber interest and sales opportunities that would drive transformation from traditional gateways to Amedia's "Broadband Entertainment Center for the networked home."

105. By press release dated November 14, 2006, Motorola, Inc. ("Motorola") announced that it had signed an agreement to acquire Netopia, Inc. ("Netopia"), a broadband, "triple play" service provider, and a competitor of Amedia.

106. In a publically filed form SB-2, dated January 26, 2007, and in a publically filed form 10KSB, dated May 18, 2007, Amedia intentionally omitted from disclosing the negative affect that Motorola's purchase had, and likely would continue to have, on Amedia, instead falsely stating that "We *cannot assess* what effect, if any, the transaction with Netopia will have on our business or on our relationship with Motorola." (Emphasis supplied).

107. Defendant Galuppo, in or about November or December, 2006, in telephonic statements he made directly to Plaintiffs, and or representatives of Plaintiffs, contended that Motorola's acquisition of Netopia would not be detrimental to Amedia.

108. At the time that Defendant Galuppo represented that Motorola's purchase of Netopia would not harm Amedia, Defendant Galuppo knew, or should have known, that such representation was false when made, and were made to induce Plaintiffs and other investors to invest in Amedia, and/or to purchase and retain Amedia common stock.

109. Defendant Galuppo continued to falsely tout Amedia's prospects, and to intentionally omit from disclosing the harm that Motorola's purchase of Netopia was causing and likely would cause Amedia in a Dececmber, 2006 meeting with representatives of Plaintiffs.

110.  More specifically, in or about mid-December, 2006, a representative of Plaintiffs met with Defendants Galuppo and Gardner at Amedia's office.  At this meeting, Defendants Galuppo and Gardner made the following express representations:

        a.      Amedia had a purchase order in place with Motorola, which could be worth as much as $45 million to Amedia;

        b.      Defendants considered the above $45 million figure to be relatively small as compared to the sales that Defendants ultimately expected from Amedia;

        c.      Amedia's technology was at the at the "top" of then-current telecommunications, broadband/triple-play technology, and that they had no doubt whatsoever that Amedia would become one of the largest players in the telecommunications, broadband/triple-play technology field;

        d.      Defendant Galuppo had very strong relationships in the industry, developed in connection with his former position with Lucent Technologies, and that Defendant Galuppo's ties would substantially aid Amedia in receiving substantial purchase orders.;

        e.      A former Lucent CEO, who was running a venture capital fund, had expressed interest in investing in Amedia;

        f.      Defendants were in advanced negotiations with top players in the telecommunications/broadband market, such as Verizon, Tellabs and Alcatel;

        g.      Defendants believed that a deal with Verizon could be completed as soon as the third quarter of 2007;

        h.      Amedia already had agreements in place with Verizon and Tellabs for Amedia to supply them with a fiber-optic system for home use;

      i.     Defendants had no doubt that Tellabs ultimately was going to work with Amedia, because Tellabs was losing money, approximately $80.00 per unit, in a deal Tellabs had with Verizon (which was buying only from Tellabs and Motorola), and that by working with Amedia, Tellabs would substantially reduce its costs and be able to turn a profit on Tellabs deal with Verizon;

      j.     Defendants believed that Amedia would have a written agreement with Tellabs by the end of January, 2007 – in approximately one and one-half months from then; and

      k.     Defendants expected to reach sales of $100 million per year for their new broadband system.

      111. Defendants knew, or should have known, that the representations made by Defendants Galuppo and Gardner during the meeting held in or about mid-December, 2006, were false when they were made, and that:

      a.     Amedia did not have a purchase order in place with Motorola, which could be worth as much as $45 million to Amedia;

      b.     Defendants did not consider, or even know, that the above $45 million figure was relatively small as compared to the sales that Defendants ultimately expected from Amedia;

      c.     Amedia's technology was not at the at the "top" of then-current telecommunications, broadband/triple-play technology, and Defendants did not have no doubt whatsoever that Amedia would become one of the largest players in the telecommunications, broadband/triple-play technology field;

32

     d.     Defendant Galuppo did not have very strong relationships in the industry, developed in connection with his former position with Lucent Technologies, that would substantially aid Amedia in receiving substantial purchase orders;

     e.     A former Lucent CEO, who was running a venture capital fund, did not express meaningful interest in investing in Amedia;

     f.     Defendants were not in advanced negotiations with top players in the telecommunications/broadband market, such as Verizon, Tellabs and Alcatel;

     g.     Defendants did not believe that a deal with Verizon could be completed as soon as the third quarter of 2007;

     h.     Amedia did not already have agreements in place with Verizon and Tellabs for Amedia to supply them with a fiber-optic system for home use;

     i.     Defendants did not have no doubt that Tellabs ultimately was going to work with Amedia;

     j.     Defendants did not believe that Amedia would have a written agreement with Tellabs by the end of January, 2007 – in approximately one and one-half months from then; and

     k.     Defendants did not expect to reach sales of $100 million per year for their new broadband system.

     112.  On December 19, 2006, Amedia issued a press release captioned "Amedia to Showcase All-in-One Residential Gateway at CES -- Set to Replace PC as the Multimedia Center of the Networked Home."   According to Amedia, this Gateway would provide, among

other things, "home networking," a "software operating system," "internet access," "media

storage," a "media library portal," and "wireless HDTV."

      113.  In a press release dated January 8, 2007, Amedia announced that it

would "showcase its Broadband Entertainment System, an all-in-one gateway, home networking

appliance, and personal media library, at the 2007 International CES (Consumer Electronics

Show) . . . in Las Vegas, NV."  In this press release Defendant Galuppo is quoted as stating that

'The Broadcast Entertainment Center is ushering a new trend, consolidating the home network

into a single appliance, and allowing subscribers to more easily and comfortably enjoy there

home media experience – without compromising quality.'

      114.  Also on January 8, 2007, in a telephone conversation with a representative

of Plaintiffs, Defendant Galuppo stated that negotiations were going very well with Telecom and

that, at the same time, Amedia was far along in serious negotiations with Verizon.

      115.  Defendant Galuppo knew, or should have known, that the telephonic

representations he made on January 8, 2007 were untrue and that negotiations were not going

well with Telecom, and that negotiations with Verizon were going nowhere.

      116.  Amedia's January 31, 2007 press release, captioned "Amedia Issues 2007

Operational Update," Motorola MIPX Gateway Shipments and Trials, Along with A Buzz-

Worthy Showing at CES Help Kick-Off 2007 in High Gear," continued the enthusiastic, highly

positive, stream of press releases by Amedia.  In this press release Amedia claimed that its

momentum from the prior year when "key strategic relationships were formed and major product

development milestones were reached" was "continuing" into 2007.  In this press release Amedia

also touted the press that covered its CES demonstration, the success of its products, and its

excitement over the "ever-growing partnership opportunities and steadily escalating market potential for Amedia in 2007."

117.  In a February 5, 2007 press release Amedia announced that "Amedia was To Deliver First-Ever GPON Home Gateway With Built-In Home Networking And Media Library"

118.  On or about March 13, 2007, a representative of Plaintiffs spoke by telephone with Defendant Gardner.  During this conversation, Defendant Gardner advised that Motorola was very pleased with the progress of the prototypes it was developing with Amedia and that Defendants expected a purchase order in 2007 from Motorola of 50,000 units of Amedia's broadband product.

119.  Defendant Gardner's representations made during the March 13, 2007 telephone conversation were false when made, and Defendant Gardner knew, or should have known, that Motorola was not very pleased with the progress of the prototypes it was developing with Amedia and that Defendants did not expect a purchase order in 2007 from Motorola of 50,000 units of Amedia's broadband product.

120.  On May 1, 2007 Amedia announced that it had approved a 10 to 1 forward stock split, claiming that the purpose of the split was to "improve trading liquidity, broaden ownership and enhance overall shareholder value."  In the May 1, 2007 press release, Defendant Galuppo continued with his enthusiastic positive spin on Amedia, stating that:  'Over the past months, we have achieved several product development breakthroughs while at the same time continuing to build strong relationships with new and existing partners, and are pleased to share this success with out shareholders.'

121.  On June 12, 2007, Amedia announced that it had reached a new

licensing agreement with Motorola.  Defendant Galuppo characterized the new Motorola deal,

and the Amedia situation, as follows:

- "We are very pleased about the terms of the licensing agreement with Motorola, which generates immediate and ongoing revenue for Amedia without additional investments in a capital intensive manufacturing effort – and for the fact our relationship with a global industry force remains strong."

- 'It is truly a win-win for both companies . . . Amedia can continue to concentrate on its strength of innovating and developing software for next generation home networking and residential gateways.'

122.   Less than two weeks later, Amedia issued another press release, on June

25, 2007, announcing a "restructuring of the company's strategy."  In this press release,

Defendant Galuppo stated that:

- 'We are extremely proud of the work we have done for Motorola over the past year.  We have proven that we can develop high-quality carrier class products on time and within budget.' 'With that milestone now met, we plan to move away from capital intensive product manufacturing and focus on continued innovation in the development of a software platform for the rapidly evolving home gateway and home media center markets.'

- 'In order to align ourselves with a rapidly changing residential gateway market, we are restructuring the company's strategy to put greater focus on building leading edge software applications on our extensive base of developed residential gateway software.'

- Amedia was in 'active discussions' for 'joint product development' and exploring licensing of intellectual property through these partners/ industry leaders;

- 'As a result of this shift in strategy we have made a number of changes that have resulted in reducing our expenditures by more than 50%, reflecting staff adjustments and other cost adjustments.'

123.   Notwithstanding the severe changes being made at Amedia, Defendant Galuppo continued to maintain that prospects for Amedia were bright stating that: "our new strategy. . . leverages our core strength of software development," and "we are excited about the prospect of being an innovative player in this emerging technology, particularly in a marketplace that promises to bring internet TV to tens of millions of homes in the next few years."

124.   In a letter from Defendant Galuppo to Amedia shareholders, including Plaintiffs, dated July 24, 2007, Defendant Galuppo made several representations about the purported "positive outlook" for Amedia, including, among others, the following:

- "Over the last year we have achieved major product development milestones, recorded our first significant revenue from shipments oof equipment to Motorola for US residential trials of the jointly developed MIPX home gateway, successfully re-negotiated the Motorola manufacturing agreement from a capital intensive production commitment to a software licensing agreement, advanced various customer and partner discussions and launched a new product development program that promises to bring video content from internet websites around the world to to the TV set. *All of this progress positions us to be a significant player in the home networking/entertainment marketplace*." (Emphasis supplied).

- As Verizon FIOS accelerates its rollout and as AT&T leads the way for new copper broadband deployments, "*we are well positioned to become a significant player in the home gateway marketplace*." (Emphasis supplied).

- The MIPX product jointly developed with Motorola "is the first line of IP home gateways offering expanded support for data, IPTV, High Definition TV, and Digital Video Recorders via Motorola's existing Multi-Service Access Platform."

- "In Q4 2006, Amedia successfully passed the IPTV Gateway System Verification Testing Acceptance Test – a major engineering milestone in the Strategic Alliance Agreement between the companies [Amedia and Motorola]."

- "Amedia and Motorola successfully completed an Alpha trial with a mid-tier communications company in the US Mid-west in February 2007."

- "In Q1 2007, Amedia shipped almost $300,000 of units to Motorola for use in customer Beta trials.  The Beta trial with the same customer started in late February and has been progressing very smoothly."

- "The work with Motorola demonstrates that our development team can deliver a high-quality product on time and on budget."

- In exchange for transferring manufacturing to Motorola, "Amedia has entered into a licensing agreement with Motorola where Motorola has committed to pay per-unit royalty payment for each unit beyond a predefined number.  A significant upfront advance on such royalty payment was made in June 2007.  *This is a win-win for both companies . . . . Amedia will receive an ongoing profitable stream* for the IP we created in the product. . . ." (Emphasis supplied).

- "In addition to the development of the Motorola MIPX product, out team has successfully completed extensive testing with a number if next generation access equipment vendors, further validating the quality and innovation of our products."

- "*Amedia has been attaining a reputation as a leading edge technology company* with an ability to successfully demonstrate new software innovations." (Emphasis supplied).

- "As a result of the work with both Motorola and a variety of other leading service providers, Amedia has developed a comprehensive software stack that can be implemented through licensing agreements on other vendors' home gateway hardware platforms.  It is our plan to exploit these opportunities . . . ."

- "Another area we are excited about is our development focus on our Broadband Entertainment Center platform, which was one of the most talked about new ideas in Q1 2007 . . . . showcased at this year's Consumer Electronic's Show in Las Vegas, *this product has captured the attention of the media as it moves the customer demarcation line from outside the house to inside. Media coverage included Telephony, CED Weekly, Telecommunications Magazine, TVOver.net, Business Weekly, TMCNet.com, Telecom Paper, Online Reporter, Broadband Properties and more.* The core of the Broadband Entertainment Center Platform will be the ability to browse the internet from the comfort of the family room on the TV, and bring the video content back from websites around the

world to the TV without the need of a traditional computer." (Emphasis supplied).

- "Over the last three years we have made considerable investment in the software and hardware development including the work completed for Motorola.  The investment now provides us great opportunity to position Amedia as a leading supplier of Home Gateway products that extend to the exploding home networking and internet video services market."

- "I am confident that our change in strategy to capitalize on our product development achievements over the last three years with a smaller, more focused team and our growing reputation among industry decision-makers as an innovative company, offer *a very positive outlook for Amedia in the coming months*." (Emphasis supplied).

125.  Amedia continued to portray a bright outlook in future press releases, where it reiterated certain of the representations made in the July 24, 2007 shareholder letter, and made additional representation about the purported success of the Company, including, among others, the following:

- In a July 30, 2007 press release, Amedia stated that 'Reaching its three-year anniversary in March, the company has continued its momentum by achieving more product development milestones, recording significant initial revenue from shipments of equipment to Motorola for US residential trials . . . , successfully re-negotiating the Motorola manufacturing agreement . . . to a software licensing agreement that maximizes return, extending . . . strategic customer and partner discussions, and launching a new product development program that promises to bring video content from internet websites . . . to the TV set, without the need for a computer;'

- In an August 2, press release Amedia announced a new agreement to "Penetrate Burgeoning Asian markets with Broadband Home Gateways." Defendant Galuppo stated in this press release that 'Major Asian cities are aggressively implementing triple play services and this represents a huge market opportunity for us.' 'This agreement is in line with Amedia's strategy of leveraging its Home Gateway software platform commercializing it for sale as products customized for the regional markets.'

- Amedia continued to tout its Broadband Entertainment Center, with Defendant Galuppo stating in an August 6, 2007 press release that this Entertainment Center 'represents the cornerstone of our new strategies going forward,' and that this technology is 'state-of-the-art' and 'revolutionary.'

- By press release dated August 15, 2007, Defendant Galuppo stated that 'We are extremely pleased in the progress made in the first half of the year,' during which Amedia realized its 'first significant revenue.'

126.  Amedia issued one final press release, on August 30, 2007 announcing approval of the stock split.

127.  On September 17, 2007 Amedia moved its office to a new rent free location and stated in a Form 8-K, filed on September 20, 2007, that "if the Company is unable to raise additional capital on an immediate basis, it will be forced to cease operations entirely."

128.  Purportedly, unable to obtain additional private financing, Amedia ceased all business operations on February 12, 2008.

## COUNT I

### (Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder)

129.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 128 as if set forth in full herein.

130.  The shares of Amedia common stock purchased by Plaintiffs are "securities" as defined in Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

131.  Defendants, by use of means of instrumentalities of interstate commerce or of the mails, engaged in the use of manipulative and deceptive practices in connection with the

40

purchase of Amedia stock by Plaintiffs in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder.

132.   Such manipulative and deceptive acts included, *inter alia*, the Amedia Defendants' intentionally and/or recklessly misrepresenting material facts in Amedia Newsletters, press releases and public filings, during Amedia quarterly conference calls, on Amedia's web site and in numerous publications.

133.   The Amedia Defendants also fraudulently omitted disclosing to the public the material information that the foregoing representations were untrue and/or became untrue.

134.   Upon information and belief, based upon all of the foregoing, the Individual Amedia Defendants knowingly and/or recklessly made such untrue representations and omissions to artificially inflate the market price of Amedia common stock and to induce, *inter alia*, Plaintiffs into purchasing  Amedia common stock, to enable the  Amedia Defendants (and their relatives) to continue to collect exorbitant salaries, benefits and other perks from Amedia and to enable individual Amedia Defendants to dump overpriced Amedia stock on unsuspecting investors, including Plaintiffs.

135.   As a result of such Defendants' manipulative and deceptive fraudulent conduct, Plaintiffs have been damaged in an amount to be determined at trial, but reasonably believed to be not less than $5 million, plus prejudgment interest.

## COUNT II

### (Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder: Fraud-on-the-Market-Based Reliance)

136.  Plaintiffs repeat and reallege each and every allegation set forth is paragraphs 1 through 135 as if set forth in full herein.

137.  At relevant times, Amedia common stock was traded on the NASDAQ the OTC Bulletin Board, ("OTC BB") under the symbol "AANI".

138.  The OTC BB is a well recognized market, responsive to publicly disclosed information in which approximately 3700 securities generally trade on a daily basis with an average daily volume in excess of 1 billion shares and which includes in excess of 230 participating market matters.

139.  Amedia stock, in particular, traded in a very efficient market, in that the price of the stock was highly responsive to press releases, public filings and other publicly disclosed information.  Accordingly, the false representations made by the Amedia Defendants directly effected the price of Amedia stock and caused reasonable investors (including Plaintiffs) to be deceived concerning the value of Amedia common stock.

140.  At relevant times, Amedia stock was followed by several securities analysts, and had many market markers.

141.  At relevant times, these and other  analysts and market makers issued "buy," "strong buy," and/or "accumulate" ratings or recommendations based upon, among other things, the false and fraudulent public information and omissions disseminated by Defendants concerning Amedia's business prospects.

42

142.   At relevant times, Amedia and its products also received considerable attention from the press and other media.  The Amedia Defendants used these and other publications to further publicly disseminate  their false and fraudulent statements concerning Amedia's business prospects throughout the United States, Israel, and other European countries.

143.   At the times of Plaintiffs' purchases of Amedia stock, the market price of Amedia stock was artificially inflated by the public misinformation released and fraudulent omissions, by the Amedia Defendants, and trading volume was also affected by such public misinformation.

144.   By virtue of the foregoing, the Defendants committed a fraud-on-the-market, damaging Plaintiffs in an amount to be determined at trial, but reasonably expected to be not less than $5 million.

## COUNT III

### (Violation of Section 20(a) of the Exchange Act and Section 15 of the Securities Act)

145.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 144 as if set forth in full herein.

146.   Plaintiffs assert this Count against the Individual Amedia Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and Section 15 of the Securities Act, 15 U.S.C. 77(o).

147.   By virtue of, *inter alia*, their positions, at all relevant times, as officers or officers and directors of Amedia, directly involved in the day to day operation of Amedia, the Individual Amedia Defendants had the power and ability, and exercised the same, to control the

operations of the Company in connection with Amedia's use of manipulative and deceptive practices with respect to Plaintiffs' purchases and retention of Amedia common stock.

148.  Each of the Individual Amedia Defendants also directly participated in the dissemination of the false and fraudulent press releases, public filings, public conference calls and/or public interviews.

149.  As such, the Individual Amedia Defendants are "control persons" of Amedia and are liable to Plaintiffs for the fraudulent acts and omissions of Amedia.

## COUNT IV

### (Common Law Fraud)

150.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 149 as if set forth in full herein.

151.  The foregoing false representations and omissions were material and, upon information and belief, were known to be false at the time they were made (and/or at the time of the material omissions) and/or were recklessly made or omitted from being made, and were made (or omitted) to permit the Amedia Defendants to continue to collect their exorbitant salaries, perks and other benefits, to artificially inflate the market price of Amedia stock, and to induce, *inter alia*, Plaintiffs to purchase and retain Amedia stock, to enable the Amedia Defendants (and their relatives) to continue to collect exorbitant salaries, benefits and other perks from Amedia.

152.  Plaintiffs justifiably and reasonably relied on such material representations and omissions in purchasing and retaining Amedia stock, and Plaintiffs would not have purchased and retained the Amedia stock absent such false and fraudulent representations and omissions.

44

153.  By virtue of Defendants' fraudulent conduct, Plaintiffs have been damaged in an amount to be determined at trial but reasonably believed to be not less than $5 million.

154.  Because Defendants' fraudulent conduct was wanton, willful, malicious and done in reckless disregard for the well being of Plaintiffs (and the public), Plaintiffs are entitled to punitive damages in an amount not less than $50 million.

## COUNT V

### (Constructive Fraud)

155.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 154 as if set forth in full herein.

156.  By participating in the scheme to defraud Plaintiffs, by publicly disseminating the aforementioned false and fraudulent material information, and the material omissions the Individual Amedia Defendants deceived Plaintiffs and induced them to purchase and retain Amedia stock.

157.  The fraudulent representations and omissions of Defendants were in breach of their legal and equitable duties and were fraudulent in law because of their tendency to deceive others, including Plaintiffs, to violate public confidence and to injure public interests.

158.  In connection with such misrepresentations and omissions, Defendants had knowledge superior to that of Plaintiffs and the general public, and had a duty to know the truth with respect to such representations and omissions and based on their active role and participation in disseminating or causing to be disseminated the false material information (and omissions) are liable for constructive fraud.

45

159. Accordingly, Defendants are liable to Plaintiffs for Plaintiffs' damages in an amount to be determined at trial, but reasonably believed to be not less than $5 million.

160. Because Defendants' conduct was wanton, willful, malicious and done in reckless disregard for the well being of Plaintiffs (and the public), Plaintiffs are entitled to punitive damages in an amount not less than $50 million.

## COUNT VI

### Negligent Misrepresentation

161. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs1 through 160 as if set forth in full herein.

162. In connection with preparing and publicly disseminating the false material information, and in connection with the omissions of material information, Defendants negligently misrepresented such information to Plaintiffs (and the general public).

163. As a direct and proximate result of Defendants' aforesaid conduct, Plaintiffs purchased and retained Amedia stock, and have been damaged in an amount to be determined at trial, but reasonably believed to be not less than $5 million.

164. Because Defendants' conduct was wanton, willful, malicious and done in reckless disregard for the well being of Plaintiffs (and the public), and constituted gross negligence, Plaintiffs are entitled to punitive damages in an amount not less than $50 million.

## COUNT VII

### (Conspiracy to Commit Fraud)

165. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 164 as if set forth in full herein.

46

166.  Upon information and belief, based upon their course of conduct, their participation in the issuance of the false public representations and omissions and contrary information obtained by Plaintiffs, the Amedia Defendants acted in concert to publicly disseminate the material false and fraudulent information, and to omit disclosing the truth.

167.  Defendants engaged in a common course of conduct and participated in the conspiracy to, *inter alia*, artificially inflate the price of Amedia stock and fraudulently induce Plaintiffs to purchase and retain Amedia common stock and thereby to permit such Defendants to, *inter alia*, continue to collect their exorbitant salaries, perks and other benefits from Amedia for themselves and their families.

168.  By virtue of Defendants' aforesaid conduct, Plaintiffs have been damaged in an amount to be determined at trial, but reasonably believed to be not less than $5 million.

169.  Because Defendants' conduct was wanton, willful, malicious and done in reckless disregard for the well being of Plaintiffs (and the public), Plaintiffs are entitled to punitive damages in an amount not less than $50 million.

## COUNT VIII

### (Breach of Contract Against Amedia)

170.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 169 as if set forth in full herein.

171.  By virtue of Amedia's breach of its agreements with defendants, defendants have been damaged in an amount to be determined at trial, but reasonably believe to be not less than $2 million.

47

**WHEREFORE**, Plaintiffs demand judgment as follows:

a.  On their First Count, damages in an amount to be determined at trial, but reasonably believed to be not less than $5 million, plus prejudgment interest;

b.  On their Second Count, damages in an amount to be determined at trial, but reasonably believed to be not less than $5 million, plus prejudgment interest;

c.  On their Third Count, damages in an amount to be determined at trial, but reasonably believed to be not less than $5 million, plus prejudgment interest;

d.  On their Fourth Count, damages in an amount to be determined at trial, but reasonably believed to be not less than $5 million, plus prejudgment interest, plus punitive damages in an amount to be determined at trial, but not less than $50 million;

e.  On their Fifth Count, damages in an amount to be determined at trial, but reasonably believed to be not less than $5 million, plus prejudgment interest, plus punitive damages in an amount to be determined at trial, but not less than $50 million;

f.  On their Sixth Count, damages in an amount to be determined at trial, but reasonably believed to be not less than $5 million, plus prejudgment interest, plus punitive damages in an amount to be determined at trial, but not less than $50 million;

g.  On the Seventh Count, damages in an amount to be determined at trial, but reasonably believed to be not less than $5 million, plus prejudgment interest,

plus punitive damages in an amount to be determined at trial, but not less than $50million; and

h.   On the Eighth Count, damages in an amount to be determined at trial, but reasonably believed to be not less than $2 million, plus prejudgment interest; and

i.   Such other and further relief as the Court deems just and proper, including reasonable attorney's fees, costs and disbursements.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues triable of right to a jury pursuant to F.R.C.P. 38.

Dated: New York, New York
       June 24, 2009

**HELLER, HOROWITZ & FEIT, PC.**

By: _____
       Clifford J Bond (CB-4679)
      292 Madison Avenue
      New York, New York 10017
      (212) 685-7600

*Attorneys for Plaintiffs*

49